1 BERMAN O'CONNOR & MANN
  Suite 503, Bank of Guam Bldg.
2 111 Chalan Santo Papa
  Hagatna, Guam 96910
3 Telephone No.: (671) 477-2778
  Facsimile No.: (671) 477-4366
4
  Attorneys for Plaintiff:
5 *R.G.M.*

6                    **IN THE UNITED STATES DISTRICT COURT OF GUAM**

7  R.G.M.,                                    )   CIVIL ACTION NO. _____
                                              )
8                       Plaintiff,            )
                                              )
9            vs.                              )   **VERIFIED COMPLAINT FOR**
                                              )   **DAMAGES FOR:**
10 BOY SCOUTS OF AMERICA, a                   )
   congressionally chartered corporation,     )   1. **Negligence**
11 authorized to do business in Guam;         )   2. **Negligent Supervision**
   BOY SCOUTS OF AMERICA ALOHA                )   3. **Negligent Hiring and Retention**
12 COUNSEL CHAMORRO DISTRICT;                 )   4. **Breach of Fiduciary Duty /**
   DOE ENTITIES 1-5; and DOE-                 )      **Confidential Relationship**
13 INDIVIDUALS 6-50, inclusive,               )
                                              )   **JURY TRIAL DEMANDED**
14                      Defendants.           )
                                              )
15 _____  )

16         Plaintiff R.G.M. ("R.G.M.") files this Complaint for damages based on prior

17 sexual abuse (the "Complaint") against Defendants Boy Scouts of America, a

18 congressionally chartered corporation, authorized to do business on Guam, the Boy

19 Scouts of America Aloha Council Chamorro District, ¬ and DOES 1-50 ("Defendants").

20                        **I.    JURISDICTION AND VENUE**

21         1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

22         2.    Venue is appropriate because this is the location in which a substantial

23 part of the events or omissions giving rise to the claim occurred.

24                              **II.    PARTIES**

25         3.    At all times relevant hereto, R.G.M. has been and is an individual who

26 attended Church at the Barrigada Parish, Guam, during his childhood years. When he

27 was a minor boy, R.G.M. was sexually abused by Louis Brouillard, an ordained priest

1    of the Roman Catholic Archbishop of Agana, and a scoutmaster for the Boy Scouts of

2    America and its Boy Scouts of America Aloha Council Chamorro District. R.G.M. is

3    currently 53 years old. Plaintiff R.G.M. is identified throughout this complaint by his

4    initials in order to protect his privacy.

5      4.      At all times relevant hereto, and upon information and belief, Roman

6    Catholic Archbishop of Agana, a corporation sole, in accordance with the discipline

7    and government of the Roman Catholic Church, is the legal name for the Archbishop

8    of Agana, also known as Archdiocese of Agana. ("Agana Archdiocese"), which is and

9    has been at all time relevant hereto a non-profit corporation organized and existing

10    under the laws of Guam, authorized to conduct business and conducting business in

11    Guam, with its principal place of business in Guam. The Agana Archdiocese is an

12    entity under the control of the Holy See, based in Vatican City, Rome, Italy. The Agana

13    Archdiocese filed for Chapter 11 Bankruptcy in the Guam District Court in BK Case

14    No. 19-00010. Plaintiff will pursue his claims against the Agana Archdiocese strictly

15    within the Bankruptcy proceeding.

16      5.      At all times relevant hereto, and upon information and belief, the Boy

17    Scouts of America ("BSA") was a corporation authorized to do business in Guam, and

18    to this day, BSA regularly transacts business throughout Guam. At all times relevant

19    to this complaint, BSA authorized local councils and local organizations to charter,

20    sponsor, and operate Boy Scout troops throughout Guam, including defendant Boy

21    Scouts of America Aloha Council Chamorro District ("Aloha Council"). The BSA and

22    Aloha Council participated in, if not directly controlled, the selections of Scout leaders

23    and troops, and retained and exercised the ultimate authority to decide who could be

24    a Scout troop leader. The BSA and Aloha Council also had the right to control the

25    means and manner of the staffing, operation, and oversight of any Scout troop. In

26    exchange for the use of BSA's name, programming, and endorsement, the leaders and

members of the individual Scout troops would pay BSA an annual membership fee.

1  BSA is responsible and liable in whole or in part, directly or indirectly, for the

2  wrongful acts complained of herein.

3     6.     At all times relevant hereto, and upon information and belief, the Aloha

4  Council, which is and has been a non-profit corporation that regularly conducted

5  business in Guam, and acted as an agent of BSA under its direction, supervision, and

6  jurisdiction. Aloha Council is responsible and liable in whole or in part, directly or

7  indirectly, for the wrongful acts complained of herein.

8     7.     The BSA and Aloha Council operate Scouting programs, which invite

9  and seek out the participation of children. The BSA and Aloha Council, through their

10  Scout leaders, employees, servants, officers, volunteers, and/or agents, have control

11  over those activities involving children. BSA has the power to appoint, supervise,

12  monitor, restrict and fire each person working with children within the Boy Scout

13  program.

14     8.     At all times relevant hereto, Father Louis Brouillard ("Brouillard"), an

15  individual and an agent of the Agana Archdiocese, was a member of the clergy of the

16  Agana Archdiocese, and a Catholic priest working for the Agana Archdiocese.

17  Brouillard was ordained as a Catholic Priest in December 1948, and arrived on Guam

18  in 1949 where he worked in parishes and schools until 1981. At all times relevant

19  hereto, Brouillard was also an employee, volunteer, and/or agent of the BSA, who

20  worked as a scoutmaster and performed duties for the Aloha Council. On or about

21  October 11, 2018, Brouillard died at the age of 97. If not deceased, Brouillard would

22  have been individually liable, in whole or in part, directly or indirectly, for the

23  wrongful acts complained of herein.

24     9.     Defendant-entities named herein as DOES 1-5, inclusive, are or at all

25  times relevant hereto, were insurance companies that provided general liability

26  coverage and/or excess level liability coverage pursuant to policies issued to the BSA,

and the Aloha Council. Defendant-individuals named here-in as DOES 6-50, inclusive,

and at all times relevant hereto, were agents, employees, representatives and/or affiliated entities of the BSA, and the Aloha Council, whose true names and capacities are unknown to R.G.M. who therefore sues such defendants by such fictitious names, and who will amend the Complaint to show the true names and capacities of each such DOE defendant when ascertained. DOES 6-50 assisted, aided and abetted and/or conspired with Brouillard, the BSA, and/or the Aloha Council to conceal, disguise, cover up, and/or promote the wrongful acts complained of herein. As such, each such DOE is legally responsible in some manner for the events, happenings, and/or tortious and unlawful conduct that caused the injuries and damages alleged in this Complaint.

10.     Each defendant is the agent, servant and/or employee of other defendants, and each defendant was acting within the course and scope of his, her or its authority as an agent, servant and/or employee of the other defendants. Defendants, and each of them, are individuals, corporations, alter egos and partnerships of each other and other entities which engaged in, joined in and conspired with the other wrongdoers in carrying out the tortious and unlawful activities described in this Complaint; and defendants, each of them, ratified the acts of the other defendants as described in this Complaint.

## III.     INTRODUCTORY ALLEGATIONS

### A. Culture of Sexually Predatory Behavior

11.     Since the inception of the priesthood many centuries ago, becoming a Catholic priest has required numerous vows to be taken among them a vow of celibacy, obedience to the laws of both God and society, and a variety of responsibilities that elevated priests, nuns, and entities that utilized the services of priests and nuns, to a high status in the community, which induced parents to entrust their children to the care of priests and likewise induced children to submit to the commands and will of priests.

12. The creation of the ritual of altar boy service as a component of the Catholic mass and other religious services with the Catholic Church, if not originally conceived as such, ultimately became a tool by which a sexually predatory priest could gain access to young boys and such access was disguised in the form of privileged opportunities by which the church invited certain young boys to serve as altar boys, an opportunity that was viewed as a respectable and distinguished role for a young boy in the community gave the boy status of wearing liturgical apparel during church service and working side by side with the priests.

13. Further disguising the scheme to have sexual access to young boys was the ritual of requiring altar boys to spend the night at the church rectory, ostensibly to facilitate preparation for the following morning church services. By presenting the overnight requests in this manner, priests routinely gained the approval of parents; and often times the sexual abuses occurred during the night in their beds at the priests' residences. These seemingly routine practices of having altar boys stay overnight served a predatory priest with a steady supply of victims under the auspices and pretense of formal church protocol, which allowed the church to continually operate a veritable harem of young boys who were readily available to pedophiles who utilized the stature of the church into deceiving the community to regard them as high-level well intentioned officials.

14. The systematic and ongoing pattern of sexual abuse of young children was characteristic of an internal society within the Agana Archdiocese and whose norms were based on pedophilic conduct disguised by the rituals and pageantry of liturgical services, together with the aura or prestige that was inculcated in the community and which caused Catholic parishioners to place the highest level of confidence and trust in the church and its clergy. On information and belief, this internal society of sexual corruption sustained itself through a conspiratorial arrangement between priests and high officials in the Agana Archdiocese whereby

1    they all understood and agreed to remain quiet about each others sexual abuse

2    misconduct, to tolerate such misconduct, and to withhold information about such

3    misconduct from third parties including victims' parents or guardians and law

4    enforcements authorities, in order to protect the offenders and the Agana Archdiocese,

5    thereby placing their loyalty above their duty to protect the minor children and their

6    legal responsibilities.

7         15.    Although BSA was originally conceived in the early twentieth century

8    out of a philosophy of good will aimed at promoting the health development of young

9    boys, the Catholic Church developed and maintained a relationship with the BSA in

10   Guam by which a pedophilic priest could exploit the opportunity to serve as a

11   scoutmaster for the specific purpose of having access to young boys. As alleged herein,

12   and on information and belief, this relationship between the BSA, the Aloha Council

13   and the Catholic Church resulted in numerous instances of sexual abuse and

14   molestation which were committed willfully by individual priests and were allowed

15   to occur due to the gross negligence and recklessness of the Agana Archdiocese, the

16   BSA, and the Aloha Council, which failed to properly oversee and manage this

17   relationship between the entities as alleged in more detail herein. On information and

18   belief, the BSA and the Aloha Council were willing to overlook and ignore the

19   sexually predatory conduct of a Catholic priest on Guam as part of a symbiotic

20   relationship between the entities by which the BSA and the Aloha Council gained

21   monetary revenues through the enrollment of young boys, and priests gained access to

22   boys to act out sexually abusive and predatory behaviors.

23        16.    On information and belief, sexually abusive practices arising out of the

24   relationship between BSA, the Aloha Council, and the Agana Archdiocese were

25   another extension of the internal culture of sexual corruption and abuse that

26   characterized the Agana Archdiocese in Guam.

17.     On information and belief, these sexually predatory norms were an integral part of the standards and culture generated by the central authority of the Roman Catholic Church based in Vatican City, Italy, which closely controlled the operations of the Agana Archdiocese, and which aided and abetted such sexually predatory and abusive practices by priests by failing to properly supervise the Agana Archdiocese to prevent sexual misconduct, and engaging in actions to protect and shield priests through such policies as transfers to other jurisdictions, maintaining an internal code of silence, and choosing to remain willfully blind to the ongoing sexual misconduct committed by Catholic priests.

18.     These sexually predatory norms were also an integral part of the long-term relationship between the Agana Archdiocese and the BSA which fostered an environment conductive to the sexual abuse of young boys on Guam by encouraging priests to serve as Scout leaders and exploiting the trust placed in the church by the community of Guam such that parents willingly enrolled their young sons as Boy Scouts and entrusted them to the priest-scout leaders during scouting events and overnight outings, while the Agana Archdiocese and the BSA tolerated and remained negligently blind to the rampant sexual abuse that was perpetuated on an ongoing basis.

**B.  The Hiring and Retention of Brouillard**

19.     Brouillard was born at St. Cloud, Minnesota, on July 27, 1921.

20.     He attended the St. Paul Seminary in St. Paul, Minnesota, for three years as a Theology student, but was expelled in 1947 because of his associating too much with young boys.

21.     Brouillard became interested in Guam after meeting two Guamanian students at a Catholic boys school in St. Paul.

22.     Brouillard offered his services to Bishop Apollinaris Baumgartner on Guam. Although Bishop Baumgartner was aware of Brouillard's expulsion from St.

Paul Seminary, he nevertheless made arrangements for Brouillard to complete his preparation for the priesthood at St. Thomas Seminary in Denver, Colorado, and the Capuchins, through Bishop Baumgartner, paid for his attendance there.

23. Brouillard arrived on Guam in 1949, and assumed his role as a priest.

24. Bishop Baumgartner was a Capuchin. The Capuchins were primarily responsible for the administration of the Catholic Church on Guam until approximately 1970.

25. Brouillard was not a Capuchin, but was under the control and direction of the Capuchins through Bishop Baumgartner, who had hired Brouillard despite his expulsion from the St. Paul Seminary.

26. Bishop Baumgartner assigned Brouillard to various parishes on Guam over the years. In 1961, Brouillard allowed boys to stay overnight in his rectory in Mangilao, and was instructed in writing by Bishop Baumgartner to stop that practice. Brouillard failed to do so, and was again instructed in writing in 1962 by Bishop Baumgartner to immediately discontinue the custom of allowing boys to live in his rectory. Brouillard, however, again failed to comply with this instruction.

27. Brouillard had multiple discussions with Bishop Baumgartner and other priests over the years regarding Brouillard's problems with sexually abusing children. Bishop Baumgartner told Brouillard to try to do better and say prayers in penance.

28. During the period of July, 2016, through September, 2016, Brouillard met on several occasions with an investigator retained by other claimants counsel, in the course of which Brouillard made several admissions regarding his past sexual abuse of minor boys while serving in both his capacities as a priest and as a scoutmaster in Guam.

29. As a follow up to the meetings with the investigator, on or about October 03, 2016, Brouillard signed a statement admitting to sexually abusing at least twenty (20) boys. A true and accurate copy of Brouillard's statement is attached hereto as

Exhibit "1". While the statement contains admissions, it also contains remarks that seek to minimize the misconduct as reflected in the excerpts below:

a) "My name is Father Louis Brouillard. I am a retired Roman Catholic priest. ...I served the diocese of Guam in the 1940s through 1970s and held many positions in the church."

b) "Looking back now, I realize that I crossed the line with some of my actions and relationship with the boys."

c) "During some of the sex education talks, while at Santa Teresita, I did touch the penises of some of the boys and some of the boys did perform oral sex on me. Some of the incidents took place in Mangilao at the rectory of the Santa Teresita Church. Because of the many years that have passed, I do not remember the exact dates and times or the names of the boys involved. There may have been 20 or more boys involved. Other locations where the sexual contact may have happened would be at San Vicente and Father Duenas Memorial Schools."

d) "At that time, I did believe that the boys enjoyed the sexual contact and I also had self gratification as well."

e) "I have come to learn the name of one of the boys I had sexual contact with at the Santa Teresita rectory. His name is Leo Tudela. ... I apologize to you Leo and the rest of the boys that I may have harmed. I regret with all my heart any wrong I did to them. I pray for all the boys I may have harmed and ask for their forgiveness from God."

f) "While in Guam my actions were discussed and confessed to area priests as well as Bishop Apollinaris Baumgartner who had approached me to talk about the situation. I was told to try to do better and say prayers as a penance."

g) "I believe the Catholic Church should be honest and truthful regarding what happened on Guam during my time there."

30. Despite extensive knowledge of Brouillard's sexual abuse of children, the Capuchins through Bishop Baumgartner failed to take any action to discipline,

1    reprimand or to remove Brouillard from Guam or to otherwise protect the Chamorro

2    children on Guam from abuse that was highly foreseeable to continue.

3        31.      After the primary responsibility for the administration of the Catholic

4    Church on Guam passed from the Capuchins to the Agana Archdiocese in

5    approximately 1970, Brouillard continued his known clerical sexual abuse of children.

6        32.      In 1970, Bishop Baumgartner passed away, and he was replaced by a

7    diocesan (Non-Capuchin) priest, Felixberto C. Flores, who was named Bishop of

8    Agana ("Bishop Flores").

9        33.      Brouillard also had many discussions with Bishop Flores regarding his

10    abuse, including one or more occasions when complaints had been made to legal

11    authorities regarding Brouillard's abuse of children.

12        34.      Despite such knowledge, Bishop Flores did not remove Brouillard from

13    Guam until April 2, 1981, in order to allow Brouillard to avoid arrest and criminal

14    prosecution for his clerical sexual abuse of children.

15    **C.**    <u>**Sexual Abuse Inflicted on Plaintiff R.G.M.**</u>

16        35.      In or around 1977-1978, when R.G.M. was the age of eleven (11) through

17    twelve (12), he was sexually abused on a Boy Scout outing. R.G.M. was an altar boy at

18    the Barrigada San Vicente Catholic Church. He was also a Boy Scout at Barrigada

19    during that same period of time. During this time, Brouillard was a priest, and he was

20    an employee, volunteer, and/or agent of the BSA. Brouillard worked as a scoutmaster

21    and performed duties for the Aloha Council.

22        36.      The BSA has maintained that no boy can grow into the best kind of

23    citizenship without recognizing his obligation to God. The first part of the Scout Oath is:

24    "On my honor to do my best to do my duty to God" and the 12th point of the Scout Law

25    is "A Scout is reverent." The BSA and Aloha Council encouraged its members to be

26    faithful in their religious duties and to serve the church, and as a result the Boy Scout

activities that R.G.M. participated in revolved around the church.

37.     Brouillard engaged in sexually predatory practices as a scoutmaster for the BSA and the Aloha Council, when he conducted regular BSA outings. R.G.M. was aspiring to join the Boy Scouts during Brouillard's time as a Boy Scout leader. R.G.M. went on two BSA outings to the Lonfit River. R.G.M. understood from the other boys that if the Boy Scouts removed their clothes and swam naked, that in exchange they would receive free fast food, which R.G.M. in fact did at McDonald's.

38.     On one of the BSA outings to the Lonfit River, R.G.M. was sexually abused by Brouillard. This occurred on one occasion while R.G.M. swam naked and Brouillard fondled and groped his genitals. Brouillard falsely claimed he was teaching R.G.M. how to swim. This event was shocking to R.G.M. and because of this, he stopped being an altar boy and he also lost interest in joining the BSA.

39.     Upon information and belief, other priests and representatives of the Agana Archdiocese, including Bishop Apollinaris Baumgartner, Bishop Felixberto C. Flores, Archbishop Anthony S. Apuron, Monsignor Zoilo Camacho, now-deceased Father Antonio C. Cruz, and individuals named herein as DOE defendants, were aware of the sexual abuse committed by Brouillard and deliberately remained quiet and withheld such information from third parties including victim's parents or guardians and law enforcement authorities, in order to protect Brouillard and the Agana Archdiocese, thereby placing their loyalty to the church above their duty to protect the minor children and their legal responsibilities.

40.     Upon information and belief, the BSA and the Aloha Council knew of, or should have known, that Brouillard was a sexual predator of young boys before he sexually abused R.G.M. because Brouillard had been committing acts of sexual molestation as a Boy Scout leader for approximately at least two and one-half decades prior to sexually abusing R.G.M. It was well-known for years that Brouillard used his positions as a scoutmaster to take boys swimming in the nude and to sexually abuse Scout campers during overnight and day trips.

- 11 -

41.    On at least one occasion, a BSA executive on Guam named John Seigal confronted Brouillard with stories that he had sexual activities with boys at scout camp. Brouillard agreed to stop sexual activities with boys, but failed to do so. No action was taken by the BSA against Brouillard.

42.    BSA has had a long history of sexual molestation and abuse of young boys that has been documented extensively both in the media and through numerous civil and criminal litigations throughout the United States. There have been numerous Scout leaders that have been sentenced in criminal prosecution for acts of sexual molestation of minor boys. As a general reference the following Internet links can be viewed online:

*https://en.wikipedia.org/wiki/Boy_Scouts_of_America*

*https://en.wikipedia.org/wiki/Boy_Scouts_of_America_sex_abuse_cases*

*https://www.theguardian.com/world/2010/apr/29/boy-scouts-sexual-abuse-dykes*

*http://www.thenationaltriallawyers.org/2015/03/boy-scout-abuse/*

*http://www.reuters.com/article/us-usa-boyscouts-abuse-idUSBRE89H0ZF20121018*

43.    Upon information and belief, the BSA and Aloha Council were notified regarding Brouillard's acts of sexual molestation. The BSA and Aloha Council had known since the early 1920's that men like Brouillard were using their positions as scoutmasters to groom and sexually abuse Boy Scouts.

44.    Founded in 1910, the BSA is one of the largest youth organizations in the United States with millions of members. Throughout the BSA's history, it has consistently held itself out to the public as a "moral and safe" environment for boys to participate in healthy outdoors activities and to be given proper guidance and instructions. Millions of parents and Scouts have placed their trust in the BSA. An estimated 20% of American boys have had contact with Scouting either as members or by attending Boy Scout activities.

45.    Upon information and belief, shortly after its inception, the BSA became aware that a significant number of its adult Scout leaders, employees, servants, officers,

volunteers, and/or agents were using their position of trust and authority to manipulate and sexually abuse young boys participating in the BSA's Scouting program.

46. Surprisingly, the BSA still continued to promote the safety, trustworthiness, and wholesomeness of its program, even though it has been secretly removing scoutmasters for child sexual abuse at an alarming rate since the 1920s. Its own records demonstrate that the BSA has long-known yet concealed from its members, Scouts, and Scouts parents that Scouting attracts pedophiles in large numbers and that Scouts, far from being safe, are at heightened risks of sexual abuse by child molesters. The BSA misrepresented to members, Scouts and Scouts parents that the Scouts were safe in Scouting programs.

47. Beginning in the 1920s, the BSA created and maintained a highly confidential file system that is often referred to as the "Ineligible Volunteer" files. The purpose of the Ineligible Volunteer files was to identify Scout leaders, employees, servants, officers, and volunteers, and/or agents of the BSA who were considered "ineligible" to hold positions as a Scout leader, who posed a danger to children because of a variety of moral offenses and who were declared unfit to volunteer. One of those moral offenses was "perversion" with children. The most common reason for Scout leaders, employees, servants, officers, volunteers, and/or agents of the BSA to be placed in the Ineligible Volunteer files has been allegations of sexual abuse of boys. The majority of the cases on file are perversion cases, and the BSA has referred to the subset of Ineligible Volunteer files as the "Perversion Files".

48. Upon information and belief, between 1965 and 1985, at least 1,200 "perversion" files were created for Scout leaders, employees, servants, officers, volunteers, and/or agents of the BSA who had molested one or more children. There was an average of more than one new child molester a week, and many of these volunteers molested multiple Scouts and other boys. The BSA knew that not all

- 13 -

molesters in Scouting were caught each year, particularly because some of the molesters were shown to have abused Scouts and other boys for several years before detection.

49.     The BSA went to significant lengths to keep the existence of their Perversion File system and the problem of pedophiles Scout leaders a secret from its members, Scouts, and Scout families. Upon information and belief, local councils, like the Aloha Council, were instructed, and agreed, not to keep Perversion Files at their offices, but rather to send everything to the BSA National Office. This was a material risk that was unique to the Boy Scout program and was not something that R.G.M., R.G.M.'s parents/or guardians, or the general populations knew existed.

50.     At some point in or about 1971, the Aloha Council was aware or should have been aware that scoutmasters within the Aloha Council posed a danger of sexually abusing Boy Scouts. The Aloha Council gained this knowledge through reports of sexual abuse by scoutmasters operating within the Aloha Council's geographic boundaries.

51.     For example, on information and belief, in or about 1971 or 1972, the Chamorro Council Scout Executive, Roger D. Pelz, reported that the assistant scoutmaster of Troop 32, David Joseph Ellington, initiated sexual contact with two minor boys at the U.S. Coast Guard Naval Station in Guam. Mr. Ellington subsequently left the area and relocated to Phoenix, Arizona, where he attempted to re-enroll in the BSA as a Scout leader, employee, servant, officer, volunteer, and/or agent.

52.     Despite knowing that more than a thousand men like Mr. Ellington had used their positions in the BSA to groom and to sexually abuse children, the BSA and Aloha Council never warned R.G.M., R.G.M.'s parents/or guardians, or other children about danger of sexual abuse in Scouting.

53.     Prior to the sexual molestation and abuse of R.G.M., BSA knew or should have known that its Ineligible Volunteer Files and Perversion Files system did not function as it was intended, was flawed, and in many cases was ineffective to address

the sustained problem of sexual abuse of young boys by Scout leaders, employees, servants, officers, volunteers, and/or agents of the BSA. Despite that knowledge, the BSA did nothing to educate its members, Scouts and Scouts parents of the ineffectiveness of the screening and tracking system and process. The BSA did nothing to educate or inform members, Scouts and Scouts parents of the enormity of the pedophile problem, nor did the BSA take action to correct its screening and/or education system.

54. Instead, the BSA and its local councils, including the Aloha Council, on information and belief, intentionally and actively concealed the continuous and systematic danger of sexual abuse of boys in their programs by Scout leaders. The BSA and the Aloha Council also actively promoted and represented to the public that their Scouting programs were safe and wholesome and that their Scout leaders were safe and trustworthy.

55. The BSA and the Aloha Council knew that Scouting, a closed system over which the Boys Scouts held exclusive control related to participation and access, was and still continues to be used by child molesters to gain access to and the trust of Scouts, other boys, their families and the community. The BSA and the Aloha Council knew that the majority of boys who were abused occurred during one-on-one situations, and that R.G.M., R.G.M.'s parents and/or guardians and the families of other Boy Scouts would consider this to be a material risk. Nevertheless, the BSA and the Aloha Council did nothing to warn R.G.M., R.G.M.'s parents/or guardians or any of the other Boy Scouts or their parents and/or guardians of the risks of molestation by Scout leaders, employees, servants, officers, volunteers, and/or agents of BSA, and the BSA did nothing to change the Boy Scout program prior to the representations and omission they made to R.G.M., R.G.M. 's parents and/or guardians, or any of the other Boy Scouts or their parents and/or guardians regarding Brouillard. Instead, the BSA continued to make the same representations and omission to R.G.M., R.G.M.'s parents

and/or guardians, or any of the other Boy Scouts or their parents and/or guardians, knowing they were false and knowing they were being relied upon by them.

56.     The BSA and the Aloha Council made these representations and omissions with the intent of inducing R.G.M., R.G.M.'s parents and/or guardians, or any of the other Boy Scouts or their parents and/or guardians, to rely on these representations and omissions so they would continue to trust the BSA, Aloha Council, and Brouillard and continue to pay to participate in Scouting.

57.     The BSA and the Aloha Council knew that if they revealed the truth, their revenues would sharply decrease, they would lose their prestige and reputation as a "safe program for boys", and they would likely face liability for the thousand of boys who had already been sexually abused by Scout leaders, employees, servants, officers, volunteers, and/or agents of the BSA.

58.     For example, upon information and belief, on or about December 4, 1972, BSA's Executive Director of Registration and Subscription Services, Paul I. Ernst ("Ernst"), sent a "personal and confidential" letter from the BSA's national headquarters to "all Scout executives" with the subject "Maintaining Standards of Leadership." In the letter, Ernst informed his Scout executives that he was enclosing guidelines that were "carefully developed" by the BSA, but "because of the misunderstandings which could develop if it were widely distributed", he instructed them to avoid sharing it "beyond the top management of your council". The memorandum outlined the manner in which local councils should report accusations, however urges that the policy be kept confidential, advised the BSA staff to tell unfit leaders that their actions would not be reported to anyone including law enforcement, and stated that in some instances, the BSA was even willing to re-admit leaders whose names have been included in the confidential files.

59.     Upon information and belief, in another letter from Ernst to a local council executive, dated on or about December 15, 1981, regarding a reported sexual predator

Ernst wrote, "We have always asked that all the records in this type of situation be kept in the national office and not in the local council office because of the embarrassment that could be incurred if the wrong individuals would read the file."

60.    The BSA's existing policies and procedures were not working to protect the boys from being sexually abused by Scout leaders, employees, servants, officers, volunteers, and/or agents of the BSA. Despite knowing that their policies were insufficient, the BSA and the Aloha Council did nothing to warn R.G.M., R.G.M.'s parents and/or guardians, or any of the other Boy Scouts or their parents and/or guardians of that danger. Instead, they kept representing that the BSA program was completely safe and its Scout leaders, employees, servants, officers, volunteers, and/or agents were completely safe. Although the BSA eventually changed its policies and procedure, it only did so after it was too late to protect R.G.M.

61.    In or about 2012, the BSA was forced by court order to release over 20,000 pages of documentation on about 1,200 alleged child sex abuse cases within the organization, covering the time period from approximately 1965 to 1985.

62.    On information and belief, the BSA and the Aloha Council continues to make false and misleading public statements regarding the risks of sexual abuse in Scouting; continues to minimize and downplay the harm of sexual abuse to children in Scouting; failed to reach out to provide support and assistance to boys it knows were sexually abused by adult Scout leaders; continues to deny the truth about its historical knowledge of the nature and extent of sexual abuse of scouts by adult Scout leaders; and fails and refuses to take responsibility for their gross negligence for hiring, retaining, or engaging the services of pedophiles.

63.    At all times relevant hereto, Brouillard sexually abused R.G.M. when R.G.M. was a minor and committed such acts while serving as a priest in the Barrigada Parish, in both of his capacities as an agent and employee of the Agana Archdiocese,

1  and/or while working as a scoutmaster for the BSA and the Aloha Council, which are

2  vicariously liable for his actions.

3      64.    The BSA, the Aloha Council, and DOES 1-50, inclusive, knew or should

4  have known, that Brouillard had sexually abused R.G.M. and rather than reporting the

5  matter to law enforcement and without intervening so as to prevent Brouillard from

6  engaging in additional instances of sexual abuse, and without seeking to have

7  Brouillard acknowledge and take responsibility for his wrongful actions, they assisted

8  Brouillard with the specific purpose or design to keep Brouillard's misconduct hidden

9  and secret; to hinder or prevent Brouillard's apprehension and prosecution; and to

10  protect the BSA, Aloha Council, Agana Archdiocese, as well as the Roman Catholic

11  church as an international institution. Such tactics included paying Brouillard a

12  monthly stipend for many years up until his death, despite being inactive as a priest.

13      65.    To this day, the BSA, the Aloha Council, DOES 1-50 never contacted

14  R.G.M., R.G.M.'s family, or children they know Brouillard had sexual contact with. The

15  BSA, the Aloha Council, and DOES 1-50 have been content with the situation that any

16  other children that were sexually abused by Brouillard while he was serving as a priest

17  and/or scoutmaster, will remain affected by guilt, shame and emotional distress.

18      66.    Despite the prolonged and egregious sexual abuse, spanning a period of

19  several decades, neither the BSA, the Aloha Council, the Agana Archdiocese, nor the

20  Roman Catholic Church ever formally disciplined Brouillard.

21      67.    In fact, the Agana Archdiocese has paid and continued to pay up through

22  Brouillard's death, sums of money to Brouillard on a regular basis, ostensibly under the

23  guise of a retirement stipend. Brouillard's name was included on a list released by the

24  Duluth diocese in December, 2013, of priests who had been credibly accused of sexual

25  abuse of young persons while serving in the diocese.

26      68.    The criminal offense of Child Abuse is defined in 9 GCA § 31.30, which

states in pertinent part as follows:

a) A person is guilty of child abuse when:

    1) He subjects a child to cruel mistreatment; or

    2) Having a child in his care or custody or under his control, he:

        (B) subjects that child to cruel mistreatment; or

        (C) unreasonably causes or permits the physical or, emotional health of that child to be endangered

69. Under 19 GCA § 13101, the following relevant definitions are provided:

b) Abused or neglected child means a child whose physical or mental health or welfare is harmed or threatened with harm by the acts or omissions of the person(s) responsible for the child's welfare;

d) Child means a person under the age of 18 years;

t) Harm to a child's physical health or welfare occurs in a case where there exists evidence of injury, including but not limited to:

(2) Any case where the child has been the victim of a sexual offense as defined in the Criminal and Correctional Code; or

(3) Any case where there exists injury to the psychological capacity of a child such as failure to thrive, extreme mental distress, or gross emotional or verbal degradation as is evidenced by an observable and substantial impairment in the child's ability to function within a normal range of performance with due regard to the child's culture(.)

70. Under 9 GCA § 25A201, "sexual conduct" with a minor is defined as follows:

(o) Sexual Conduct means acts of sexual penetration, sexual contact, masturbation, bestiality, deviate sexual intercourse, sadomasochistic abuse, or lascivious exhibition of the genital or public area of a minor.

71. Under 9 GCA § 25.10(8), "sexual contact" is defined as follows:

(8) Sexual Contact includes the intentional touching of a victim's or actor's intimate parts of the intentional touching of the clothing covering the immediate area of the victim's or actor's intimate parts, if that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification.

72. Under 9 GCA § 28.65, the crime of Indecent Exposure is set forth in pertinent part as follows:

> (a)   A person is guilty of criminal sexual conduct in the second degree if the person engages in sexual contact with another person and if any of the following circumstances exists:
>
> (1)   that other person is under fourteen (14) years of age;
>
> (2)   that other person is at least fourteen (14) but less than sixteen (16) years of age and the actor is a member of the same household as the victim, or is related by blood of affinity to the fourth degree to the victim, or is in a position of authority over the victim and the actor used this authority to coerce the victim to submit.

73. Under 9 GCA § 28.65, the crime of Indecent Exposure is set forth in pertinent part as follows:

> A person is guilty of indecent exposure if he exposes his genitals or performs any other lewd act under circumstances in which his conduct is likely to be observed by any person who would be offended or alarmed.

74. Under 19 GCA § 13201(b), the following are required to report child abuse:

> (b)   Persons required to report suspected child abuse under Subsection (a) include, but are not limited to, … clergy member of any religious faith, or other similar functionary or employee of any church, place of worship, or other religious organization whose primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, …

## IV.   <u>FIRST CAUSE OF ACTION</u>

**Child Sexual Abuse [Against Defendants the BSA, Aloha Council, and DOES 1-50]**

75.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 74 of this Complaint as if fully set forth herein.

76.     Defendants the BSA, Aloha Council, and DOES 1-50 (collectively "Defendants" as alleged in this cause of action) are vicariously liable for the sexual abuse committed upon R.G.M. by Brouillard. Public policy dictates that Defendants should be held responsible for Brouillard's wrongful conduct under the theory commonly referred to as *Respondeat Superior*.

77.     For the reasons set forth in the incorporated paragraphs of this Complaint, the sexual abuse of R.G.M. arose from and was incidental to Brouillard's employment with, or service on behalf of the Agana Archdiocese, the BSA, and the Aloha Council, and while Brouillard was acting within the scope of his employment with the Agana Archdiocese and service on behalf of the BSA or its Aloha Council, at the time he committed the acts of sexual abuse, which were foreseeable to Defendants.

78.     Defendants, on information and belief, ratified and/or approved of Brouillard's sexual abuse by failing to adequately investigate, discharge, discipline and/or supervise Brouillard and other priests, Scout leaders, employees, servants, officers, volunteers, and/or agents known by Defendants to have sexually abused children, or to have been accused of sexually abusing children; by concealing evidence of Brouillard's sexual abuse both as a priest and as a scoutmaster; failing to intervene to prevent ongoing and/or further sexual abuse; by failing to report the sexual abuse as required under 19 GCA § 13201(b); by allowing Brouillard for decades to continue in service as a Catholic priest working for the Agana Archdiocese and as a scoutmaster for the BSA and its Aloha Council.

79.     Despite the pretense of policies and procedures to investigate and address instances of child sexual abuse by priests working for the Agana Archdiocese, and serving as Scout leaders on behalf of the BSA and the Aloha Council, as well as their employees, servants, officers, volunteers, and/or agents. Defendants, on information and belief, implemented such policies and procedures for the purpose of avoiding scandal, to maintain secrecy and to preserve loyalty to fellow clergy of the

Agana Archdiocese, and to serve as Scout leaders on behalf of the BSA and the Aloha Council, as well as their employees, servants, officers volunteers, and/or agents, including child molesting clergy working for the Agana Archdiocese, and serving as Scout leaders on behalf of the BSA and the Aloha Council, rather than the protection of children. Such hypocritical conduct by Defendants has served to systematically encourage, perpetuate and promote sexually abusive conduct by priests both in their role as clergy for the Agana Archdiocese, and as Scout leaders for the BSA and the Aloha Council.

80. The Agana Archdiocese either had actual knowledge of Brouillard's sexual abuse of numerous other minors whom Brouillard victimized, or could have, or should have, reasonably foreseen that Brouillard was committing and would commit sexual abuse of other minors. Such knowledge included direct awareness by former Agana Archbishop Apollinaris Baumgartner, as reflected in the following excerpt from Brouillard's statement attached hereto as Exhibit "1":

> "While in Guam my actions were discussed and confessed to area priests as well as Bishop Apollinaris Baumgartner who had approached me to talk about the situation. I was told to try to do better and say prayers as a penance."

81. Defendants BSA and its Aloha Council either had actual knowledge of Brouillard's sexual abuse of numerous other minors whom Brouillard victimized, or could have, or should have, reasonably foreseen that Brouillard was committing and would commit sexual abuse of other minors. To date the BSA has acknowledged that Brouillard victimized minor boys while serving as a scoutmaster, as reflected in the excerpts taken from an interview with Jeff Sulzbach, the chief executive officer of the Boy Scouts of America Aloha Council on March 5, 2017, attached hereto as Exhibit "2":

> "Upon learning of the reports, we took immediate action to preclude individual (Brouillard) from any further participation in the scouting program." Though Sulzbach

could not say when exactly the Boy Scouts became aware of
the reports of Brouillard's sexual abuse of children on Guam,
he said it was possible that the organization did not take
action against the priest until sometime after the 1970s."

82.     As a direct and proximate result of the Defendants' above – described conduct, R.G.M. has suffered, and continues to suffer, great pain of mind and body, shock, emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.

83.     By engaging in the conduct described herein, Defendants acted with malice, oppression, and/or fraud, entitling R.G.M. to exemplary and punitive damages.

## V.  SECOND CAUSE OF ACTION

### Negligence [Against All Defendants]

84.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 83 of this Complaint as if fully set forth herein.

85.     Defendants the BSA, Aloha Council, and DOES 1-50 (collectively "Defendants" as alleged in this cause of action) had a duty to protect R.G.M. when he was entrusted to Brouillard's care by R.G.M.'s parents. R.G.M.'s care, welfare, and/or physical custody were temporarily entrusted to Defendants, and Defendants accepted the entrusted care of R.G.M. As such, Defendants owed to R.G.M., as a child at the time, a special duty of care, in addition to a duty of ordinary care, and owed to R.G.M. the higher duty of care that adults dealings with children owe to protect them from harm.

86.     By virtue of this unique authority and position as a Roman Catholic priest and/or a scoutmaster, on information and belief, Brouillard was able to identify vulnerable victims and their families upon which he could perform such sexual abuse; to manipulate his authority to procure compliance with his sexual demands from his victims; to induce the victims to continue to allow the abuse; and to coerce them not to

report it to any other persons or authorities. As a priest and as a scoutmaster, Brouillard had unique access to a position of authority within Roman Catholic families and/or families that were actively involved in activities sponsored by the BSA and its Aloha Council, like the family of R.G.M. such access, authority and reverence was known to the Defendants and encouraged by them.

87.    Defendants, by and through their agents, servants and employees, knew or reasonably should have known, of Brouillard's sexually abusive and exploitative propensities and/or that Brouillard was an unfit agent. If was foreseeable that if Defendants did not adequately exercise or provide the duty of care owed to children in their care, including but not limited to R.G.M., the children entrusted to Defendants' care would be vulnerable to sexual abuse by Brouillard.

88.    Defendants breached their duty of care to the minor R.G.M. by allowing Brouillard to come into contact with R.G.M. as a child without supervision; by failing to adequately supervise, or negligently retaining Brouillard whom they permitted and enabled to have access to R.G.M.; by failing to properly investigate; by failing to inform, or concealing from R.G.M.'s parents, guardians, or law enforcement officials that Brouillard was or may have been sexually abusing minors; by holding out Brouillard to R.G.M.'s parents or guardians, and to the community of Guam at large, as being in good standing and trustworthy as a person of stature and integrity. Defendants cloaked within the façade of normalcy Brouillard's contact with R.G.M. and/or with other minors who were victims of Brouillard, and deliberately concealed and disguised the sexual abuse committed by Brouillard.

89.    As a direct and proximate result of the Defendants' above – described conduct, R.G.M. has suffered, and continues to suffer, great pain or mind and body, shock, emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.

90.    By engaging in the conduct described herein, Defendants acted with malice, oppression, and/or fraud, entitling R.G.M. to exemplary and punitive damages.

## VI.    THIRD CAUSE OF ACTION

### Negligent Supervision
### [Against Defendants the BSA, the Aloha Council, and DOES 1-50]

91.    Plaintiff re-alleges and incorporates by reference pages 1 through 90 of this Complaint as if fully set forth herein.

92.    Defendants the BSA, Aloha Council, and DOES 1-50 (collectively "Defendants" as alleged in this cause of action) had a duty to provide reasonable supervision of both Brouillard and the minor child, R.G.M.; to use reasonable care in investigating Brouillard; and to provide adequate warning to R.G.M.'s family, and to families of other children who were entrusted to Brouillard, of Brouillard's sexually abusive and exploitative propensities and unfitness.

93.    Defendants, by and through their agents, servants and employees, knew or reasonably should have known of Brouillard's sexually abusive and exploitative propensities and/or that Brouillard was an unfit agent. Despite such knowledge, Defendants negligently failed to supervise Brouillard in his position of trust and authority as a parish priest and/or scoutmaster, where he was able to commit the wrongful acts against R.G.M. alleged herein. Defendants failed to provide reasonable supervision of Brouillard, failed to use reasonable care in investigating Brouillard, and failed to provide adequate warning to R.G.M.'s family regarding Brouillard's sexually abusive and exploitative propensities and unfitness. Defendants further failed to take reasonable measures to prevent future sexual abuse.

94.    As a direct and proximate result of the Defendants' above – described conduct, R.G.M. has suffered, and continues to suffer, great pain of mind and body,

shock, emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.

95. By engaging in the conduct described herein, Defendants acted with malice, oppression, and/or fraud, entitling R.G.M. to exemplary and punitive damages.

## VII. FOURTH CAUSE OF ACTION

### Negligent Hiring and Retention
### [Against Defendants the BSA, Aloha Council, and DOES 1-50]

96. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 95 of this Complaint as if fully set forth herein.

97. Defendants the BSA, Aloha Council, and DOES 1-50 (collectively "Defendants" as alleged in this cause of action) had a duty not to hire, retain, or engage the services of Brouillard in light of his sexually abusive and exploitative propensities.

98. Defendants, by and through their agents, servants and employees knew, or reasonably should have known, of Brouillard's sexually abusive and exploitative propensities and/or that Brouillard was an unfit agent. Despite such knowledge and/or opportunity to learn of Brouillard's misconduct, Defendants negligently hired, retained, or engaged the services of Brouillard in his position of trust and authority as a parish priest and scoutmaster, where he was able to commit the wrongful acts against R.G.M. alleged herein. Defendants failed to properly evaluate Brouillard in advance by failing to conduct necessary screening; failed to properly evaluate Brouillard's conduct and performance as an employee of, or provider of services to the Defendants; and failed to exercise the due diligence incumbent upon employers to investigate employee misconduct, or to take appropriate disciplinary action, including immediate termination and reporting and referral of Brouillard's sexual abuse to appropriate authorities. Defendants negligently continued to retain Brouillard in his service as a Catholic priest and scoutmaster, working or providing services for Defendants, which enabled him to continue engaging in the sexually abusive and predatory behavior described herein.

99.     As a direct and proximate result of the Defendants' above – described conduct, R.G.M. has suffered, and continues to suffer, great pain of mind and body, shock, emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.

100.    By engaging in the conduct described herein, Defendants acted with malice, oppression, and/or fraud, entitling R.G.M. to exemplary and punitive damages.

## VIII.  FIFTH CAUSE OF ACTION

### Breach of Fiduciary Duty And/Or Confidential Relationship
### [Against All Defendants]

101.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 107 of this Complaint as if fully set forth herein.

102.    By holding Brouillard out as a safe, trustworthy and highly ethical scoutmaster with integrity, Defendants BSA, Aloha Council and DOES 1—50, together with Brouillard himself, invited, counseled, encouraged and induced the community of Guam, including parents or guardians of children to join the Boy Scouts; and particularly as to parents or guardians of children who were already paid members of the BSA and Aloha Council, to have trust and confidence in the BSA, the Aloha Council and its Scout leaders, employees, servants, officers, volunteers, and/or agents, and to entrust their children to the company of scoutmasters and specifically to Brouillard, including allowing their children to be alone with Brouillard without supervision, and to camp out over night at BSA and Aloha Council activities. Defendants BSA, and Aloha Council actively exploited the reputation of the Catholic Church for the purpose of encouraging membership of the Boy Scouts, thereby facilitating the availability of minor boys to a pedophilic priest. In this way, Defendants BSA, and Aloha Council, maintained a symbiotic relationship by which each recruited minors for sexual pleasures. Through such actions, Defendants collectively created and entered into a fiduciary and/or confidential relationship with its members, including parents or

guardians and their children, and in particular, children who were members of the BSA and the Aloha Council. Accordingly, Defendants collectively created and entered into a fiduciary and/or confidential relationship specifically with the minor child R.G.M.

103.    Through such fiduciary and/or confidential relationship, Defendants collectively caused parents or guardians to entrust their children to members of the Agana Archdiocese, serving both in their role as priests and scoutmasters, and specifically entrusted their children to Brouillard, including the parents of R.G.M., which resulted in R.G.M. serving as an altar boy and joining and becoming a member of the BSA and its Aloha Council and participating in its activities, resulting in the subject acts of sexual abuse described herein.

104.    Defendants collectively breached their fiduciary and/or confidential relationship with the minor child R.G.M. by violating the trust and confidence placed in them by parishioners and/or members, and specifically by the minor child R.G.M., and by engaging in the wrongful acts described in this Complaint.

105.    As a direct and proximate result of the Defendants' above – described conduct, R.G.M. has suffered, and continues to suffer, great pain of mind and body, shock, emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.

106.    By engaging in the conduct described herein, Defendants acted with malice, oppression, and/or fraud, entitling R.G.M. to exemplary and punitive damages.

## IX.    REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff R.G.M. requests judgment against all Defendants, both jointly and severally, on all counts as follows:

1.    For all general, special, exemplary and punitive damages, as allowed by law in a sum to be proven at trial and in an amount not less than $5,000,000.00;

2.    For costs and fees incurred herein;

3.    Attorneys' fees, as permitted by law; and

4. For other such and further relief as the Court may deem just and proper.

## X. DEMAND FOR JURY TRIAL

Plaintiff R.G.M., through his undersigned counsel, hereby demands a jury trial of six (6) be sought to hear the above-entitled and enumerated action.

Respectfully submitted this ____ day of _____, 2020.

BERMAN O'CONNOR & MANN

By: _____

MICHAEL J. BERMAN, ESQ.

1

## **VERIFICATION**

2     R.G.M. declares and states that he is the PLAINTIFF in the foregoing

3 COMPLAINT; that he has read said VERIFIED COMPLAINT FOR DAMAGES and

4 knows the contents thereof to be true and correct, except as to the matters which may

5 have been stated upon his information and belief; and as to those matters, he believes

6 them to be true.

7     I declare, under penalty of perjury, this 27th day of January, 2020, that the

8 foregoing is true and correct to the best of my knowledge.

9

10                          **R.G.M.**

11

12

13     SUBSCRIBED and SWORN to before me, a notary public in and for Guam, this

27th day of January, 2020, by **R.G.M.**

14

15

16                           **NOTARY PUBLIC**

17

18                 **JENNIFER BANAYAT QUITUGUA**
                     **NOTARY PUBLIC**
                  In and for Guam, U.S.A.

19            My Commission Expires: **APRIL 20, 2021**
             P.O. Box 5580, Hagatna, Guam 96932

20

21

22

23

24

25

26